**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH GRASSO, JR. et al.,**

     **Plaintiffs,**

   **v.**

**THE UNITED GROUP OF**
**COMPANIES, INC. et al.,**

    **Defendants.**
_____

       **1:16-cv-965**
       **(GLS/CFH)**

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFFS:** | |
| Keller, Rohrback Law Firm<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101 | DAVID J. KO, ESQ. |
| Keller, Rohrback Law Firm<br>3101 North Central Avenue, Suite 1400<br>Phoenix, AZ 85012 | GARY GOTTO, ESQ. |
| Devine, Snyder LLP<br>52 Corporate Circle, Suite 207<br>Albany, NY 12203 | TERENCE J. DEVINE, ESQ. |
| **FOR THE DEFENDANTS:** | |
| Cozen, O'Connor Law Firm<br>45 Broadway Atrium, 16th Floor<br>New York, NY 10006 | MATTHEW E. LEWITZ, ESQ.<br>MICHAEL B. DE LEEUW, ESQ. |
| Cozen, O'Connor Law Firm<br>277 Park Avenue, 20th Floor<br>New York, NY 10172 | TAMAR S. WISE, ESQ. |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiffs—Joseph Grasso, Jr., Kevin Kearney, Monica Kearney, Mary Ellen Kleinfeld, James Martin, Brenda Martin, Karen Szocik, Janice Wossowski, and William Wossowski, Jr.—bring this diversity action against defendants—the United Group of Companies, Inc. (UGOC), Davis Capital Group, Inc. (hereinafter "Davis"), DCG Funds Management, LLC (DCG), DCG/UGOC Funds Management II, LLC (hereinafter "Management II"), Michael J. Uccellini, Jessica F. Steffensen, (collectively, "United Defendants"), MCM Securities, LLC (MCM), and Millennium Credit Markets, LLC (hereinafter "Millennium"), (collectively, "MCM Defendants")—asserting New York State law claims of fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, and unjust enrichment against United Defendants, as well as aiding and abetting against MCM Defendants.  (*See generally* Am. Compl., Dkt. No. 8.)

2

Pending is defendants'[1] motion to dismiss plaintiffs' amended complaint under Rule 12(b)(6), (Dkt. No. 13), and plaintiffs' request for oral arguments on the same, (Dkt. No. 28).  For the following reasons, plaintiffs' motion is denied and defendants' motion is granted in part and denied in part.

## II.  Background

### A.  Facts[2]

#### 1.  The Parties

Plaintiffs are all residents[3] of Maryland who invested money between 2009 and 2011 to acquire ownership interests in the DCG/UGOC Income Fund, LLC (Income Fund).[4]  (Am. Compl. ¶¶ 1-9, 72, 73, 80, 88, 99, 109.)

---

[1] Counsel for United Defendants does not represent DCG.  (Dkt. No. 24 at 1; Dkt. No. 33 at 1 n.1.)  DCG is a wholly-owned subsidiary of Davis, member of the Income Fund, and remains named as a defendant in this action.  (Am. Compl. ¶ 10.)  The portions of the case relating to DCG and Davis are stayed pursuant to a receivership order from the Western District of North Carolina.  (Dkt. Nos. 40, 41.)  Davis' CEO, Richard Davis, Jr., has been voluntarily dismissed from this lawsuit.  (Dkt. No. 49.)

[2] Unless otherwise noted, the facts are drawn from the plaintiffs' amended complaint and presented in the light most favorable to them.

[3] Although plaintiffs bring this case in federal court pursuant to diversity jurisdiction, they do not allege where each party was domiciled at the time of commencement.  (*See generally* Am. Compl.)  However, even though not unambiguously stated, defendants do not raise this issue, and it can be reasonably inferred that the term "resides" indicates the plaintiffs' state of domicile, which appear to be completely diverse from defendants.

[4] UGOC, acting by itself, also formed United Group Income Fund II, LLC (Income Fund II), a Delaware limited liability company, which offered for sale $50 million in membership interests of $100,000 per investment unit, and was represented to have the same investment strategy and rate of return as the Income Fund.  (*Id.* ¶¶ 4, 45, 47.)  On January 4, 2011, the Uccellinis issued a private placement memorandum for Income Fund II that was distributed to Kleinfeld.  (*Id.* ¶ 46.)  Kleinfeld is the only plaintiff who acquired an ownership interest in Income Fund II.  (*Id.* ¶ 4.)  Income Fund II allegedly

The Income Fund is a North Carolina limited liability company established, managed, and operated by the United Defendants to secure financing for various real estate projects undertaken by UGOC. (*Id.* ¶¶ 1, 10-12, 14-15, 20-25.) MCM is an SEC-registered broker dealer, which was responsible for monitoring sales of securities with respect to the Income Fund. (*Id.* ¶ 16.) Millennium is an investment banking firm, majority owner of MCM, and controlled by UGOC. (*Id.* ¶ 17.)

UGOC is an investment firm that developed and managed senior multi-family communities and planned to undertake student housing projects near state universities in Plattsburgh, Brockport, and Cortland, New York. (*Id.* ¶ 21.) Walter Uccellini was the founder and chairman of UGOC and his son, Michael Uccellini, is UGOC's President and CEO.[5] (*Id.* ¶¶ 14-15.)

As a result of the 2008 financial crisis, UGOC struggled to finance their student housing plans. (*Id.* ¶¶ 22-23.) Eventually UGOC secured

---

involved the same misrepresentations and omissions as the Income Fund. (*Id.* ¶ 56.) Likewise, Income Fund II invested the entirety of its offering capital in unsecured notes receivable owed by parties unable to pay their notes and accrued interest. (*Id.* ¶ 57.) For the sake of clarity, the court's decision centers on the Income Fund; however, it applies with equal force to Kleinfeld's claims surrounding Income Fund II.

[5] Walter Uccellini passed away in August 2012. (Am. Compl. ¶ 14.) Michael Uccellini is named in his individual capacity as well as in his capacity as executor of Walter's estate, along with its executrix, Jessica Steffensen. (*Id.* ¶¶ 14-15.)

financing from TIAA-CREF, who agreed to provide UGOC with a $50 million loan conditioned upon UGOC first raising $18 million.  (*Id.* ¶ 24.)  In an effort to fulfill this condition, United Defendants established the Income Fund.  (*Id.* ¶ 25.)

   2.    *PPM and Operating Agreement*

   On August 8, 2008, United Defendants issued a private placement memorandum (PPM), which offered for sale $20 million of the Income Fund's membership interests at a price of $200,000 per unit.  (*Id.* ¶ 39.) "All of the United Defendants were involved in the preparation . . . of all disclosures made . . . in the PPM[.]"  (*Id.* ¶ 116.)  The PPM named Management II as the income fund's manager and charged it with the "overall management and administration [of the fund], including [the] acquisition, management[,] and disposition of the . . . [f]und's assets."  (*Id.* ¶ 12.)  DCG was a member of the Income Fund and UGOC was the managing member.  (*Id.*)  "All decisions regarding the use and investment of Income Fund assets were to be made by Management II as [m]anager, by and through DCG and UGOC."  (*Id.* ¶ 41.)

   The investment objective and strategy represented in the PPM was for the Income Fund to invest in [1] securities and debt instruments secured by assets and/or credible guarantors, real

5

estate and real estate related investments, [2] real estate assets which target existing properties which have achieved stabilized occupancy levels with demonstrated records of distributing cash flow or where cash flows can be significantly enhanced and [3] real estate property and investments that can be converted to cash during the next five to seven years with targeted annual current rates of returns to the Income Fund of greater than 9%.

(*Id.* ¶ 40.)  The fund's operating agreement included the same strategy. (Dkt. No. 13, Attach. 4 at 8.)

The PPM also disclosed a laundry list of risks associated with an investment in the Income Fund.  (Dkt. No. 13, Attach. 3 at 24-31.)  For instance, under the heading "**INVESTMENT CONSIDERATIONS AND RISK FACTORS**," the PPM warned that "[a]n investment in the I[ncome Fund] is highly speculative and involves significant risks, including the possible loss of the entire amount invested."  (*Id.* at 24.)

Additionally, the PPM represented that Management II could retain "placement agents," with the consent of investors, to "assist in the private placement of [i]nterests in the [Income] Fund."  (*Id.* ¶ 120.)  However, neither the PPM nor the Operating Agreement disclosed any sort of financial arrangement between UGOC and any investment advisor.  (*Id.* ¶¶ 26, 119, 124.)  The only disclosure regarding financial arrangements between UGOC and third-party entities was vaguely set out in a

6

subsequently issued publically-available form.  (*Id.* ¶¶ 121-23.)

The Income Fund was sold using the same PPM through 2011.  (*Id.* ¶ 44.)

### 3.    Conflict of Interest

Edgar Page was an investment advisor and CEO and chairman of PageOne Financial, Inc. (hereinafter "PageOne"), an SEC-registered investment advisor firm.  (*Id.* ¶ 26.)  "On December 15, 2008, Page committed PageOne to purchasing $18.3 million worth of UGOC preferred stock using its clients' assets."  (*Id.* ¶ 33.)  Amongst PageOne's clients were plaintiffs, who invested in the Income Fund upon the advice and recommendation of Page.  (*Id.* ¶ 38.)

Prior to plaintiffs' investments, UGOC had secretly agreed to buy PageOne in exchange for Page's promise to purchase UGOC preferred stock using PageOne's clients' assets.  (*Id.* ¶¶ 33-35.)  Moreover, UGOC offered to hire Page, refer him over $1 billion in assets, and provide PageOne with a commission for each sale of UGOC securities sold by Page to his clients.  (*Id.* ¶¶ 34, 36.)

Page knew that United Defendants were investing the Income Fund's assets into what turned out to be struggling student housing projects.  (*Id.*

¶¶ 50-51, 55, 58-65.)  In fact, Walter Uccellini informed Page that if UGOC could not come up with money fast, they may have to shut down the student housing project.  (*Id.* ¶ 50.)  The student housing projects faced steep obstacles from the beginning—including occupancy issues and construction failures—which defendants did not disclose in any of the oral or written communications associated with the Income Fund.  (*Id.* ¶¶ 60-62, 113-114.)  These student housing projects would eventually default, become the subject of foreclosure proceedings, and later file for bankruptcy.  (*Id.* ¶¶ 63-65.)

Nonetheless, at defendants' direction, Page met with plaintiffs and advised them to invest in the Income Fund.  (*Id.* ¶¶ 27, 38, 66-112.) Specifically, Page convinced plaintiffs that the student housing projects were "doing very well and would continue to generate [a] 9% return on investment for seven (7) years."  (*Id.* ¶¶ 101, 105-06.)  Relying on Page's advice, plaintiffs each executed subscription agreements with the Income Fund wherein they collectively paid more than $5.57 million in exchange for ownership interests in the fund.  (*Id.* ¶¶ 66-112.)

During this same period, "Walter Uccellini . . . directed MCM to refrain from performing compliance and supervisory activity regarding sale

of securities in the Income Fund." (*Id.* ¶ 207.)

On August 26, 2014, the SEC instituted proceedings against Page and PageOne. (*Id.* ¶ 125.) Subsequently, the SEC issued an Order Making Findings (hereinafter "the SEC Order"), which gave rise to plaintiffs' allegations by concluding that Page and PageOne had "willfully violated Sections 206(1) and 206(2) of the [Investment Advisers Act of 1940], which prohibit fraudulent conduct by an investment adviser[,]" and Section 207 of the Advisers Act, "which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the [SEC] . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein." (*Id.* ¶ 126) (internal quotation marks omitted). The SEC confirmed that Page failed to tell his clients about his arrangement with UGOC. (*Id.* ¶¶ 127-29.) Additionally, the SEC concluded that Page understood UGOC did not have sufficient liquidity to complete the acquisition of PageOne and they were selling personal assets to keep the business going. (*Id.* ¶ 135.) Ultimately, the SEC found that, since 2009, PageOne's clients "invested between approximately $13 and $15 million" at Page's recommendation and that during the same period, UGOC paid

9

Page approximately $2.7 million in acquisition payments.  (*Id.* ¶¶ 132-33.)

Although plaintiffs do not name Page or PageOne as defendants, they claim that Page and PageOne raised money on defendants' behalf and helped fund impermissible payments from fund assets by acting as defendants' agents.  (*Id.* ¶¶ 37, 113, 139, 144, 166.)

    *4.     Omissions and Misrepresentations*

In connection with soliciting plaintiffs' investments in the Income Fund, plaintiffs allege that United Defendants made several factual misrepresentations, including that the Income Fund would invest in secure debt instruments backed by real estate assets that could quickly be converted to cash and would generate a high annual rate of return for investors when in fact, defendants knew student housing projects faced problems—including low occupancy—which made these returns highly unlikely and risked non-payment of the fund's notes receivable.  (*Id.* ¶ 113.) Plaintiffs also allege that defendants misrepresented UGOC's dire financial situation and history of performance on similar housing projects.  (*Id.*) Additionally, plaintiffs allege that Page and United Defendants failed to disclose several facts that were material to plaintiffs' investments including:

(1) UGOC was in serious financial distress and unable to survive without investor funds;

(2) UGOC did not have sufficient finances to maintain operations so it had to use unsecured Income Fund assets to cover its operating costs;

(3) the Income Fund had invested nearly all of its assets in unsecured notes receivable to UGOC-affiliated companies;

(4) the student housing projects in Plattsburgh, Brockport, and Cortland—which had borrowed more than $7.1 million from the Income Fund—had encountered serious financial problems and low occupancy that created a material risk that the Income Fund's note receivables would not be repaid or would not generate the promised interest rate of return to investors;

(5) Income Fund assets had been used to cover personal expenses of the Uccellini family and future investments would continue to be used in that manner;

(6) UGOC and its related entities had no procedures in place to assure that Income Fund investments would only be used "to generate for its [m]embers stable and durable current yields and,

11

where possible, the potential for longer-term gains," and;

(7) the Income Fund regularly renewed unsecured loans to UGOC

affiliates and accrued interest income on such loans due at maturity

even though the United Defendants failed to assess the credit risk

exposure of each borrower entity at the time and report to investors

an adequate allowance for credit losses in the Income Fund financial

statements.  (*Id.* ¶ 114.)

5.   *Damages*

Overall, "[t]he Income Fund's assets were not invested in securities,

real estate assets and/or debt instruments secured by assets, and/or

credible guarantors, but rather were used to make unsecured loans to

UGOC [and other related parties]."  (*Id.* ¶¶ 51-52.)  Additionally, United

Defendants continued to invest fund assets into the struggling student

housing projects and funneled money to Page for the acquisition of

PageOne.  (*Id.* ¶¶ 51, 54, 58-65.)  They also used fund assets to sustain

business operations, both before and after plaintiffs invested in the Income

Fund.  (*Id.* ¶¶ 48-62.)  United Defendants also approved UGOC's use of

unsecured loans "to pay . . . personal expenses for Walter Uccellini and his

family members."  (*Id.* ¶ 53.)  Beginning in 2012, numerous debt

instruments held by the Income Fund defaulted or entered foreclosure proceedings.  (*Id.* ¶ 55.)  As a result, by the end of 2013, debt instruments totaled $13,968,929 of the Income Fund's notes receivable.  (*Id.* ¶ 52.)

In an attempt to placate investors, defendants manipulated accounting standards to report inaccurate amounts in financial statements that plaintiffs received annually.  (*Id.* ¶¶ 152-71.)  As a result, the 2011-2014 financial statements issued by defendants did not reflect the fund's actual value.[6]  (*Id.* ¶¶ 161-65.)  Instead, during this time period, defendants informed plaintiffs that their Income Fund investments were growing each year.  (*Id.* ¶ 163.)  However, the 2012 financial statements revealed that the Income Fund's investment in the SUNY Plattsburgh student housing project defaulted on its forbearance agreement and other investments faced financial issues.  (Dkt. 13, Attach. 5 at 19-20.)   In May of 2014, plaintiffs received the 2013 financial statement, (Am. Compl. ¶ 152), which revealed that student housing projects at SUNY Plattsburgh, Brockport, and Cortland all "continue to have occupancy issues and the lender commenced a foreclosure action against the project," (Dkt. No. 13,

---

[6] The audited reports from 2009 and 2010 were prepared in accordance with Generally Accepted Accounting Principles and, as such, measured fund assets at their fair value, not their actual cost basis. (Am. Compl. ¶¶ 153-54.)

Attach. 6 at 2-3).  The 2013 financial statement further cautioned that "the [Income] Fund is substantially invested in debt investments with an entity that is in foreclosure proceedings . . . [which] raise[s] substantial doubt about the [Income] Fund's ability to continue as a going concern."  (*Id.* at 6.)  Moreover, the statement reiterated that "the Fund has debt investments that have entered foreclosure proceedings . . . and has uncertainty on its ability to adequately restructure."  (*Id.* at 16.)  The statement also revealed that "debt investments . . . make up 55% of the [Income] Fund's total assets."  (*Id.*)

Despite these red flags, plaintiffs did not confirm that the value of their investments had decreased—by over 50%—until January 2015.  (*Id.* ¶ 169.)  Subsequently, plaintiffs learned of the SEC proceedings in March 2015, and met with Page who admitted that "the United Defendants had made fraudulent misrepresentations and omissions in the sale of the Income Fund."  (*Id.* ¶¶ 170-71.)

Plaintiffs allege that they would not have chosen to invest in the Income Fund had they known such facts beforehand.  (*Id.* ¶ 148.)  Now, "[u]nder the terms of the [O]perating [A]greement governing the [Income] Fund, [p]aintiffs are unable to liquidate their investment without the

14

approval of the United Defendants." (*Id.*)  Plaintiffs have since requested a

return of their investments, which United Defendants denied.  (*Id.* ¶ 150.)

## B.   <u>Procedural History</u>

Plaintiffs originally filed this diversity action against defendants on

August 2, 2016.  (Compl., Dkt. No. 1.)  On August 29, 2016, they filed an

amended complaint alleging common law fraud, breach of fiduciary duty

and/or aiding and abetting in a breach of fiduciary duty, negligent

misrepresentation, and unjust enrichment against United Defendants, (Am.

Compl. ¶¶ 172-201), and a claim of aiding and abetting against MCM

defendants, (*id.* ¶¶ 202-13).  They seek rescission of their investments plus

pre-judgment interest, monetary damages in an amount to be determined

at trial, punitive damages of $1,000,000, and attorneys' fees and costs.

(*Id.* at 40-41.)

Pending is defendants' 12(b)(6) motion to dismiss the amended

complaint in its entirety, (Dkt. No. 13), and plaintiffs' motion for oral

argument, (Dkt. No. 28).  Subsequently, plaintiffs filed two purported

"notice of supplemental facts," which attempt to add to their amended

complaint and make new arguments not raised in their response in

opposition to defendants' motion.  (Dkt. Nos. 50, 52.)  In its letter brief in

opposition to these requests, defendants seek attorneys' fees.  (Dkt. No. 53 at 3.)

### III.  <u>Standard of Review</u>[7]

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV.  <u>Discussion</u>

### A.    <u>Papers Considered</u>

In determining a Rule 12(b)(6) motion to dismiss, the court may consider the complaint, any exhibit attached to the complaint, materials incorporated by reference, and documents that are integral to the complaint.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  "This principle has its greatest applicability in cases alleging fraud *. . .* [w]hen the complaint alleges that such a document made a particular representation,

---

[7] Plaintiffs inexplicably argue that the court should apply the *Conley* pleading standard.  (Dkt. No. 27 at 9.)  However, as any first year law student knows all too well, the Supreme Court of the United States decisively laid to rest the more lenient conceivability standard of *Conley*.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Plaintiffs fail to convince the court why it should overturn the Supreme Court or re-write the Federal Rules of Civil Procedure.  As such, the court respectfully declines plaintiffs' invitation to resurrect *Conley* and recommends that plaintiffs' counsel fix his outdated template.

the court may properly look at the document to see whether that representation was made." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

The PPM and annual financial statements are all referenced in the amended complaint. (Am. Compl. ¶¶ 39-47, 52, 124, 152-65.) Plaintiffs also clearly relied upon these documents in bringing this action because they contain the alleged misrepresentations and omissions that form the basis of plaintiffs' claims. (*Id.* ¶¶ 173, 194.) As such, these documents are properly examined at this stage. *See Roth*, 489 F.3d at 509; *Sira*, 380 F.3d at 67.

However, the court declines to consider other papers submitted by plaintiffs. (Dkt. Nos. 50, 52.) Plaintiffs had ample opportunity to raise arguments in their response to defendants' motion to dismiss. Additionally, plaintiffs had the opportunity to seek leave to file a second amended complaint if they desired to supplement the operative pleadings. However, plaintiffs squandered these opportunities and cannot now bypass the Federal Rules as well as the Local Rules of Practice. *See* Fed. R. Civ. P. 15(d); N.D.N.Y. L.R. 7.1(a)(4). Given that plaintiffs' submissions, (Dkt. Nos. 50, 52), were belatedly filed without leave of court, they do not factor

into the court's decision.  *See Vaughn v. Air Line Pilots Ass'n, Int'l*, 395

B.R. 520, 534 n.9 (E.D.N.Y. 2008), *aff'd*, 604 F.3d 703 (2d Cir. 2010), and

*aff'd sub nom. Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88 (2d Cir.

2010); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D.

361, 369-70 (S.D.N.Y. 1997).

To the extent that defendants' letter brief, (Dkt. No. 53), is construed

as a motion for attorneys' fees for the time spent responding to plaintiffs'

papers, it is denied.  The court discerns no bad faith from plaintiffs filing

these notices and, although they are not considered, the court is confident

that learned defense counsel expended a relatively minuscule amount of

time and effort in crafting their concise response letters.

**B.    Statute of Limitations**

The second gateway issue that warrants attention is whether seven

of the nine plaintiffs' claims were filed within the statute of limitations period

such that the court can consider them on their merits.

Both parties agree that N.Y. C.P.L.R. § 213(8) governs this analysis.

(Dkt. No. 13, Attach. 1 at 9; Dkt. No. 27 at 10.)  Section 213(8) provides

that the statute of limitations for fraud is the greater of either six years from

when the cause of action accrued or two years from the time a plaintiff

18

discovered the fraud or could have discovered it with reasonable diligence.[8] Both parties also agree that there is no question that all of Szocik's investment and three of Kleinfeld's investments were made within the general six-year statutory period.  (Dkt. No. 13, Attach. 1 at 10; Dkt. No. 27 at 10.)  As such, claims stemming from these investments are timely.

Both parties also agree that plaintiffs' claims accrued at the moment of their investments, such that the general six-year statute of limitations would not permit a timely filing of the remaining plaintiffs' claims.[9]  Instead, the parties analyze C.P.L.R. § 213(8)'s "discovery rule."  (Dkt. No. 13, Attach. 1 at 11-14; Dkt. No. 27 at 10-13).

---

[8] This same statute of limitations framework applies to plaintiffs' claims of breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and negligent misrepresentation, which all sound in fraud.  *See Ajamian v. Zakarian*, No. 1:14–CV–321, 2014 WL 4247784, at *8 (N.D.N.Y. Aug. 26, 2014); *Gonzalski v. Prudential Ins. Co. of Am.*, No: 5:02–CV–921, 2004 WL 556686, at *1 & n.6 (N.D.N.Y. Mar. 22, 2004); *see also Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 264 (1937) ("[I]n applying the [s]tatute of [l]imitations we look for . . . the essence of the action and not its mere name.").  Because defendants fail to rebut plaintiffs' contention that their unjust enrichment claim against United Defendants is timely, (Dkt. No. 27 at 33-35), the court assumes without deciding that this claim is timely and addresses it on the merits below.

[9] Given that plaintiffs' claims are rooted in misrepresentations and omissions that induced plaintiffs to invest in the Income Fund, (Am. Compl. ¶¶ 139-46, 173-80, 185, 187-89, 192-98, 200), they arguably began to accrue on the date which they made their investments.  However, neither party devotes much of their argument to discerning when plaintiffs' claims actually accrued.  Defendants tersely contend that plaintiffs' claims sounding in fraud began to accrue the moment that plaintiffs executed their investments because "any alleged misrepresentations or omissions inducing such investments t[ook] place [earlier]."  (Dkt. No. 13, Attach. 1 at 10; Dkt. No. 33 at 3.)  Relying on this same reasoning, plaintiffs do not contest that the investments of Grasso, the Martins, the Kearneys, and the Wossowskis are outside the general six-year statute of limitations and skip straight to an analysis of the discovery rule.  (Dkt. No. 27 10-13.)  Because plaintiffs adopt defendants' facially-meritorious theory that the date of the investments is controlling and do not argue that their claims are timely under the general six-year statutory period, plaintiffs have consented to defendants' supposed accrual date of their claims.  *See* N.D.N.Y. L.R. 7.1(b)(3); *Burns v. Trombly*, 624 F. Supp. 2d 185, 197-98 (N.D.N.Y. 2008).

A reasonably diligent plaintiff is deemed to have been able to discover the fraud when he is "possessed of knowledge of facts from which [the fraud] could be reasonably inferred." *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (internal quotation marks and citation omitted); *see Gutkin v. Siegal*, 85 A.D.3d 687, 688 (1st Dep't 2011) ("[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.") (quoting *Higgins v. Crouse*, 147 N.Y. 411, 416 (1895)).  Thus, the two-year statute of limitations period starts to run "when the circumstances reasonably would suggest to the plaintiff that he or she may have been defrauded, so as to trigger a duty to inquire on his or her part." *Shalik v. Hewlett Assocs., L.P.*, 93 A.D.3d 777, 778 (2d Dep't 2012) (internal quotation marks and citation omitted).

Notably, "it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts . . . establish that a duty of inquiry existed and that an inquiry was not pursued." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 155-56 (2d

20

Cir. 2012) (footnote omitted).  Here, no dispute exists as to the knowledge possessed by plaintiffs upon receiving the Income Fund's 2012-2013 financial statements.  The only quarrel is whether the knowledge gleaned from these statements was sufficient to trigger plaintiffs' duty to inquire.

In sum, defendants contend that "allegations about low occupancy rates, defaults[,] and foreclosure proceedings associated with [the student housing] investments of the Income Fund . . . were . . . fully disclosed to [p]laintiffs by . . . May of 2014" based on the 2012 and 2013 annual financial statements that they received.  (Dkt. No. 13, Attach. 1 at 12.)  Conversely, plaintiffs argue that "whatever 'storm warnings' were purportedly raised by isolated language in these financial statements, the statements taken as a whole overwhelmingly reveal that the Income Fund was not just stable, but thriving."  (Dkt. No. 27 at 13).

To be sure, the 2012 financial statement noted that the terms and conditions of a construction loan associated with the SUNY Plattsburgh student housing project had not been affected, (Dkt. No. 13, Attach. 5 at 20), and investors' collective interest in the notes receivable only decreased marginally from the previous year, (*id.* at 8, 13).  The 2013 financial statement vaguely noted undisclosed plans to revamp the struggling

21

student housing projects at SUNY Plattsburgh, Brockport, and Cortland, (Dkt. No. 13, Attach. 6 at 2-3), and, again, that investors' notes receivable only decreased marginally from the previous year, (*id.* at 9-10, 12). Additionally, both the 2012 and 2013 financial statements used an analysis centered on an income tax basis to show an increase of the fund's bottom line from the previous year.  (Dkt. No. 13, Attach. 5 at 3, 14-15; Attach. 6. at 2, 13-14.)

However, plaintiffs' argument that an objective investor would interpret these statements to offset any potential inquiry, (Dkt. No. 27 at 10-13), misses the mark.  The issue is not whether the financial statements revealed the full extent of the fraud, but whether they suggested that plaintiffs may have been defrauded so as to trigger their duty to inquire further.  *See Shalik*, 93 A.D.3d at 778.  In any event, the court agrees with defendants that "no reasonable investor would look at the serious warnings set out by the auditor—warnings that the [Income] Fund's future was in jeopardy—and rely on vague, unspecified hopes for a turnaround."  (Dkt. No. 33 at 5.)  Instead, the financial statements raised red flags that would have made a reasonable investor of ordinary intelligence aware of the probability that he had been defrauded.  *See Gutkin*, 85 A.D.3d at 688.

22

First, both financial statements clearly stated the accounting method used to demonstrate an increase in the fund's bottom line was "a basis of accounting other than accounting principles generally accepted in the United States." (Dkt. No. 13, Attach. 5 at 4; Attach No. 6 at 6).  Next, the 2012 financial statement unambiguously informed plaintiffs that the Income Fund's investment in the SUNY Plattsburgh student housing project defaulted on its forbearance agreement.  (Dkt. 13, Attach. 5 at 20.)  That same statement also detailed other financial issues faced by other Income Fund investments that had defaulted on their agreements.  (*Id.* at 19-20.)

Notably, the 2013 financial statement clearly stated that student housing projects at SUNY Plattsburgh, Brockport, and Cortland "continue to have occupancy issues" and informed plaintiffs that "the lender commenced a foreclosure action against the project[s]."  (Dkt. No. 13, Attach. 6 at 2-3.)  The 2013 financial statement further cautioned plaintiffs—in multiple sections—that "the [Income] Fund is substantially invested in debt investments with an entity that is in foreclosure proceedings . . . [which] raise[s] substantial doubt about the [Income] Fund's ability to continue as a going concern."  (*Id.* at 6, 16.)  Moreover, the 2013 financial statement alerted plaintiffs that "debt investments make up 55% of the [Income]

23

Fund's total assets." (*Id.* at 16.) Additionally, both the 2012 and 2013 audited financial statements clearly identified the fund's investments in assets that plaintiffs allege were improper. (Dkt. No. 13, Attach. 5 at 6-15; Attach. 6 at 8-12.)

These disclosures form the basis of plaintiffs' fraud allegations regarding the struggling student housing projects, (Am. Compl. ¶¶ 58-65), as well as the state of the "securities and debt instruments" the fund invested in, (*id.* ¶¶ 51, 113-14). In their amended complaint, plaintiffs admit that the financial forecast from the 2012-2013 statements "created uncertainty regarding the Income Fund's ability to continue as a going concern . . . [and] affected the debt instruments . . . of . . . student housing projects developed by UGOC and represented . . . as the primary investments to be financed using the assets of the United Funds." (*Id.* ¶ 55.) Moreover, the knowledge gleaned from the information contained within the 2012 and 2013 financial statements is completely at odds with the representations that plaintiffs allegedly relied upon. (*Id.* ¶¶ 113(C), (D), 114(D).)

A reasonable inquiry would have enabled plaintiffs to discover defendants' fraudulent conduct more than two years before filing this

24

lawsuit. However, plaintiffs do not allege an inquiry ever occurred. (*See generally* Am. Compl.) Thus, their knowledge is imputed as of the date the duty arose, *see Koch*, 699 F.3d at 155-56; *Shalik*, 93 A.D.3d at 778; *Gutkin*, 85 A.D.3d at 688, which was—at the latest—when plaintiffs received the 2013 financial statement in May of 2014, (Am. Compl. ¶ 152; Dkt. No. 13, Attach. 6 at 2). The imposition of a two-year extension from the time plaintiffs' duty of inquiry was triggered results in a filing deadline of May 2016—which is unhelpful because plaintiffs filed this lawsuit on August 2, 2016. (Dkt. No. 1.) Accordingly, the general six-year statute of limitations of C.P.L.R. § 213(8) provides plaintiffs the greatest filing time based on the date of plaintiffs' investments. (Am. Compl. ¶¶ 66-112.) However, the only investments made within this time frame are Kleinfeld's investments between August 13, 2010 and January 5, 2011 and Szocik's investments between December 30, 2010 and January 21, 2011. (*Id.* ¶¶ 88, 109.) Accordingly, the fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and negligent misrepresentation claims stemming from investments occurring earlier than August 2, 2010 are dismissed as time-barred.

**C.    Unjust Enrichment**

Plaintiffs' fourth cause of action, the only claim not considered in conjunction with the statute of limitations issue, alleges a claim of unjust enrichment against United Defendants.  (Am Compl. ¶¶ 199-201.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted).  Defendants point out that only the Income Fund, and not defendants themselves, received a benefit—identified in the amended complaint as plaintiffs' investments totaling approximately $5,572,205. (Dkt. No. 13, Attach. 1 at 33; Am. Compl. ¶¶ 66-112.)  Indeed, the amended complaint demonstrates that plaintiffs executed subscription agreements with the Income Fund for the acquisition of membership interests in the fund in exchange for money.  (Am. Compl. ¶¶ 74, 81, 90, 104, 111.)  Plaintiffs do not allege, and defendants do not argue, that the subscription agreements are invalid or unenforceable.

It is well-settled under New York law that "[t]he theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation imposed by equity to prevent injustice, *in the absence of an actual agreement* between

26

the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (emphasis added) (internal quotation marks and citation omitted); *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter[.]").

Unless the Income Fund obtained the $5,572,205 worth of investments through fraud, it was entitled to the total amount of investments by virtue of the subscription agreements that plaintiffs entered into. As such, plaintiffs have a remedy for money damages—assuming they timely file the appropriate claims—by virtue of their fraud claims stemming from their written agreement, which precludes an equitable claim arising out of the same subject matter. *See IDT Corp.*, 12 N.Y.3d at 142; *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388-89. Accordingly, the amended complaint fails to state a claim for unjust enrichment.

## V. <u>Conclusion</u>

The court has carefully considered defendants' remaining arguments—as they relate to Kleinfeld and Szocik's timely claims stemming from their collective investments of $523,770—and finds them to be without

merit.  Specifically, a resolution of defendants' arguments regarding an

agency relationship between Page and defendants, (Dkt. No. 13, Attach. 1

at 18-19; Dkt. No. 33 at 6-8), as well as whether defendants owed plaintiffs

a fiduciary duty, (Dkt. No. 13, Attach. 1 at 28-30), or maintained some other

type of "privity-like" relationship, (*id.* at 32-33), requires a more fact-specific

inquiry that cannot be conducted at this stage.  Thus, the remainder of

defendants' motion to dismiss is denied.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motion for oral argument (Dkt. No. 28) is

**DENIED**; and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 13) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to plaintiffs' unjust enrichment claim against

United Defendants and the remaining claims against all defendants

stemming from plaintiffs' investments made prior to August 2, 2010;

and

**DENIED** in all other respects; and it is further

**ORDERED** that the Clerk remove Joseph Grasso, Jr., Kevin Kearney,

Monica Kearney, James Martin, Brenda Martin, Janice Wossowski, and

28

William Wossowski, Jr. as parties to this action; and it is further

     **ORDERED** that the defendants' motion (Dkt. No. 53) is denied insofar

as it is seeking fees; and it is further

     **ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

March 26, 2018
Albany, New York

Gary L. Sharpe
U.S. District Judge

29